## International & Great Northern Railway Company
## v. P. H. Wentworth.
### No. 353.

1. **Carrier—Time Contract.**—If a carrier has agreed to carry the goods to their destination and deliver them within a prescribed time, he will be held to a performance of his contract, and no temporary obstruction, or even absolute impossibility, will be a defense to an action for failure to comply with the engagement.

2. **Receiver—Contract Void.**—A receiver has no authority to contract for the shipment of freight over other railroads over which he has no control.

3. **Carrier—Deviation from Route.**—See facts held to excuse a carrier in deviating from its regular and usual route.

Appeal from Bexar   Tried below before Hon. W. W. King.

*Barnard & McGown,* for appellant.

*Ogden & Harwood,* for appellee.

Neill, Associate Justice.—This suit was brought by the appellee, plaintiff below, against T. M. Campbell, as receiver of appellant company, to recover damages caused by delay in the delivery at their destination of sheep intrusted by appellee to Mr. Campbell, as such receiver, for transportation from Kerrville, Texas, to Chicago, Ill. Subsequently, by proper amendment, the International & Great Northern Railroad Company was made defendant, and the case proceeded to judgment against appellant alone.

The plaintiff alleged in his petition, that at the time of the shipment and accrual of the alleged damages T. M. Campbell was the duly acting and authorized receiver of said railroad company, acting under the orders of the District Court of Smith County, and as such had full control of said railroad and the property thereof, operating, managing, and controlling said road. That the San Antonio & Aransas Pass Railroad, the International & Great Northern Railroad, the Texas & Pacific Railroad, and the Chicago & Alton Railroad, then formed continuous and connecting lines of railway from Kerrville, Texas, to the city of Chicago, Ill. That each and all of said railroads were engaged in the shipment of freight, such as live stock, etc., as common carriers

for hire, each and all of said connecting lines of railway acting as through lines, and proposing and agreeing to receive and transport freight as such from any station on any of said roads to any station on any other of said roads, and to carry the same speedily, safely, and securely to the point of destination, in like order and condition as when received.  That Homer Eads was then the duly acting and authorized agent for T. M. Campbell, receiver of the International & Great Northern Railroad Company, and as such agent he agreed and contracted with plaintiff, on behalf of said receiver, to receive and transport sheep from Kerrville station to the city of San Antonio, thence over the line of the International & Great Northern Railroad, thence over the Texas & Pacific Railroad, thence over the line of the St. Louis, Iron Mountain & Southern Railroad, and thence over the line of the Chicago & Alton Railroad to the city of Chicago, and particularly over the line of the St. Louis, Iron Mountain & Southern Railroad, which was then the quickest and best route from Kerrville station to the city of Chicago, especially agreeing and contracting with plaintiff that the sheep should be transported from Kerrville to Chicago in not more than four days' time, and that they should be shipped "special," i. e., in one train, without being delayed or hindered by being shipped with other freight and other cars, but to go through in a train by itself, over the line of the said St. Louis, Iron Mountain & Southern Railroad to St. Louis, and thence over the Chicago & Alton Railroad, to Chicago; that plaintiff, when the contract was made, informed Homer Eads, and he (Eads) had full knowledge of the fact, that the sheep were in good condition for sale and shipment upon the market in Chicago as fat sheep or muttons, and that the same were being shipped for the purpose of being sold as fat sheep or muttons, and that said contract was entered into between plaintiff and defendants, through their agent, Homer Eads, with special reference to the condition of said sheep, with full knowledge on the part of defendants, through said agent, of the condition of said sheep.

That on the 28th day of May, 1892, plaintiff delivered the sheep, in accordance with said agreement, to the San Antonio & Aransas Pass Railroad, at Kerrville, in good order and condition, for sale upon the market as muttons or fat sheep, to be transported from Kerrville to the city of Chicago, for sale as aforesaid.

That in violation of the agreement made by their said agent, the defendants negligently and wrongfully delayed the shipment for a great length of time beyond the four days agreed upon, so the sheep were subject to great suffering and exposure by reason of said delay, and became poor and gaunt, and unfit for sale upon their arrival at Chicago as mutton or fat sheep.  In consequence of which he was compelled to sell the same, at a great sacrifice, to feeders, and not as fat sheep to butchers, as the same would and could have been sold had it not been for said delay.

Plaintiff further alleged, that defendants violated their said agreement between him and Homer Eads, acting for them, by failing to transport said sheep over the St. Louis, Iron Mountain & Southern Railroad, and by sending the sheep by another and different and longer route, whereas it had been especially agreed between him and defendants that the sheep should be sent by the way of the St. Louis, Iron Mountain & Southern Railroad.

The plaintiff, however, did not allege that any delay or damage was caused by such deviation from the alleged contract route; the only delay and damage alleged being, as before stated, that "defendants negligently and wrongfully delayed the shipment of said sheep for a greater length of time beyond the four days agreed upon," etc. The damages alleged were $4000.

The defendants pleaded a general denial, and specially, (1) that if the sheep were shipped over their road, as alleged by plaintiff, that such shipment was under and by virtue of a written contract (which appears in our conclusions of facts); (2) that Homer Eads was the commercial agent of defendant company, whose duty was to solicit freights, *not to make shipping contracts,* and that he did not in fact make such a contract with plaintiff, his contract being preliminary and leading up to the contract subsequently made; (3) that if defendant company was originally liable under the contract with Wentworth, as claimed by him, because of the delay, it was excused from such liability, because such delay was caused by unprecedented floods and overflows along the Iron Mountain route, over which the sheep were to be transported, which rendered impossible the carriage of traffic along said route, and to prevent greater delay, the defendant company diverted the route and sent the sheep over the Cotton Belt to Poplar Bluff, and thence along its contract route; and (4) a special denial under oath of any partnership between defendant company and the other railroads mentioned in plaintiff's petition.

By a supplemental petition, the plaintiff denied the authority of Trainer to execute the written contract, and pleaded that it was without consideration and void.

The case was tried before the court, without a jury, who filed its conclusions of fact and of law, and thereupon rendered judgment against the defendant company for $3314.90, from which judgment this appeal is prosecuted.

As the findings of fact of the court below are not excepted to, and none of the assignments of error are predicated on them, and there is evidence tending to support them all, we adopt them as our own. They are as follows:

1. On May 28, 1892, the plaintiff was the owner of 2396 head of sheep, which were shipped from Kerrville, Texas, to Chicago, Ill.

2. When these sheep left Kerrville they were fat, and would have sold as such in Chicago if they had gone there within four days' time. They were delayed en route, however, and by reason thereof plaintiff

was damaged in the sum of $3314.90. They suffered no damage except that caused from delay in shipment.

3. That at the time of this shipment the International & Great Northern Railroad Company was being operated by T. M. Campbell, as receiver, as a common carrier for hire, who has since been discharged, and the said International & Great Northern Railroad Company is, by admission, liable for any judgment which might have been rendered against the said T. M. Campbell, as receiver.

4. That at the time of this shipment the San Antonio & Aransas Pass Railroad, the International & Great Northern Railroad, the Texas & Pacific Railroad, the St. Louis, Iron Mountain & Southern Railroad, and the Chicago & Alton Railroad, formed a continuous connecting line between Kerrville, Texas, and Chicago, Ill., but no partnership existed between them.

5. The court further finds from the evidence, that one Homer Eads, during the month of May, 1892, was the duly acting and authorized commercial agent of the said receiver of the International & Great Northern Railroad Company, and that during the said month of May, to wit, on or about the 22nd, 23rd, 24th, 25th, 26th, 27th, and 28th days of May, 1892, the said Homer Eads, acting as said agent, solicited the shipment of the plaintiff's stock, consisting of 2396 head of sheep, from Kerrville station, on the line of the San Antonio & Aransas Pass Railroad, via the International & Great Northern Railroad, the Texas & Pacific Railroad, the St. Louis, Iron Mountain & Southern Railroad, and the Chicago & Alton Railroad, to the city of Chicago. Homer Eads, as commercial agent for the said International & Great Northern Railroad Company, had his headquarters at San Antonio, Texas, and was employed by the road to solicit the shipment of all kinds of freight over its line. He was authorized to fix rates and to arrange routes, and when so contracted, he ordered cars to place of shipment and directed the route. It was not his business to, and he never signed the contract of shipment made at the place of shipment.

6. That the plaintiff inquired of the said Eads what the rate of freight would be from Kerrville to Chicago, and that the said Eads referred to his tariff sheets and stated that the rate of freight would be the lowest through rate, and that in case any rebates were given to any one else, the same allowance would be made to the plaintiff; and that the said Eads would give him the lowest rate given to any one else for a like shipment.

7. That the plaintiff further stated to the said Eads, that he was informed that the roadbed of the said St. Louis, Iron Mountain & Southern Railroad was in danger of being overflowed by reason of high water, and that he feared his sheep would be delayed thereby, and that he would be greatly damaged by such delay; that he had an opportunity to ship the said stock by another route, to wit, the Missouri, Kansas & Texas Railroad, by which there would be no risk of such delay by high water, and that the plaintiff particularly and re-

peatedly requested the said Eads to be cautious in the shipment of the said stock, so as to avoid the risk of delays by high water.

8. That the said Eads, before accepting the said shipment, sent a telegram to his superior officer inquiring about the condition of the said St. Louis, Iron Mountain & Southern Railroad, and that in due time the said Eads received a reply advising him that the said St. Louis, Iron Mountain & Southern Railroad was all right, and to take the shipment; and thereupon the said Eads assured the plaintiff that there would be no delays, and took the shipment.

9. That during the time when the said Eads and the plaintiff were negotiating for the shipment of the said sheep, and particularly when the said Eads was awaiting advices concerning the high water on the St. Louis, Iron Mountain & Southern Railroad, one Jerome Harris, who is, and then was, the live stock agent of the Chicago & Alton Railroad in southwest Texas, heard of the contemplated shipment for the plaintiff over the line of the said St. Louis, Iron Mountain & Southern Railroad, went to the said Eads and advised him not to ship the same over the said St. Louis, Iron Mountain & Southern Railroad, but to send them via the Missouri, Kansas & Texas Railroad, and that the Chicago & Alton Railroad would take them from a station in Missouri called Highby, thence to Chicago. That he (Harris) was advised that the said St. Louis, Iron Mountain & Southern Railroad was in a dangerous condition, owing to the floods and high water. That for several days prior to that time, he (Harris) and the said Eads had received advices, and had discussed the same between themselves, at times stating that the St. Louis, Iron Mountain & Southern Railroad was overflowed, and at other times that it was open, so that trains could pass over it; and again that the said road was overflowed, and that freight could not pass over it.

10. That the said Eads placed the initial order for the cars, which were sent to Kerrville, in which the stock was loaded and shipped; that the said cars arrived at Kerrville in due time, and the said sheep were loaded and shipped therein.

11. That on the 28th day of May, 1892, the said sheep were loaded in the cars so ordered to Kerrville by the said Eads by one George Trainer and J. W. Trainer, who were in charge of the said sheep for the plaintiff, and who accompanied said sheep to Chicago; upon the said sheep being loaded, the station agent at Kerrville, one W. A. Polling, the agent of the San Antonio & Aransas Pass Railroad Company, presented to said George Trainer a certain "live stock contract" and pass, and requested him to execute the same before the said stock left the station, which he did. The contract is one in the ordinary form, and it is not necessary to copy it in this opinion.

*Conclusions of Law.*—Among the conclusions of law found by the trial court which are complained of by appellant, are the first, fifth, and sixth, which are respectively as follows:

"1. The negotiations and conversations between the plaintiff, Wentworth, and the said Homer Eads, set forth in the conclusions of fact herewith filed, constituted a contract between the receiver of the International & Great Northern Railroad Company on the one part, and P. H. Wentworth on the other part, for the shipment of the plaintiff's sheep from Kerrville to Chicago, via the International & Great Northern Railroad, the Texas & Pacific Railroad, the St. Louis, Iron Mountain & Southern Railroad, and the Chicago & Alton Railroad, at the lowest rates given for shipments of like character, and in not more than four days."

"5. The defendant having contracted to carry the said stock from Kerrville to Chicago over the lines of railroad herein before mentioned, and the said shipment having been diverted from the said route, the defendant became insurer of the said stock and liable for any injury that occurred thereto, from any cause."

"6. The defendant having had notice of the dangerous condition of the said St. Louis, Iron Mountain & Southern Railroad at the time of making the said contract with the plaintiff, and of the risks of damage to said sheep in case of delays, contracted with reference thereto, and assumed all risks that might arise from overflows and washouts on the said road, and the fact that said railroad did become submerged by water, and that washouts occurred thereon which delayed trains and made traffic impossible on said road, and that said washouts and overflows were caused by unprecedented high water which could not have been foreseen and guarded against in the construction and operation of the said railroad, does not relieve the defendant from liability."

As the correctness of the judgment of the court below turns upon the accuracy of these conclusions, we will pretermit all other questions and confine ourselves to a discussion of them.

The first question presented is, was the court, from the facts found by it, warranted in finding that Homer Eads made and had authority to make such a contract for the receiver of appellant's road as the court determined was made? It may be remarked, that the findings of fact by the court are insufficient to establish a contract in all its terms such as the plaintiff alleged in his petition, and that the record does not show that a contract embracing all the provisions alleged was ever entered into between the parties. According to the allegations, the contract provided that the sheep should be shipped "special," that is, "in one train, without being delayed or hindered by being shipped with other freight and other cars, but should go through in a train by itself" over the several lines of railroad specified. No principle is better established than that, where a party seeks to recover upon an express contract, he is required to prove that the contract alleged was entered into before he is entitled to recover. He can not sue on one contract and recover by proving another.

But as this point is not raised by the assignment, we will return to the question, did Homer Eads make and have authority to make such

a contract as was found to have been made by the District Court? The contract as found by the court is one by a receiver of a railroad to carry live stock not only over the road operated by him, but over several others, some of which lie outside of the State, and beyond the jurisdiction of its courts, for the lowest rate given for shipments of like character, to its destination, "in a distant State, in not more than four days." It is a time contract for a through shipment, for which the carrier, if bound at all, is bound to a strict performance. The rule is, "If a carrier has agreed to carry the goods to their destination and deliver them within a prescribed time, he will be held to a strict performance of his contract, and no temporary obstruction or even absolute impossibility will be a defense to an action for failure to comply with the engagement; for when a party by his own contract creates a duty which he engages to perform, he is bound to make it good, notwithstanding an accident or delay by inevitable necessity; because he might have provided against it by his contract." Hutch. on Carr., sec. 317. The carrier assumes responsibility as to time; but the rule of liability for injury or loss is at common law. The carrier does not become an absolute insurer of the safe delivery at all events; but is exempt if the goods be destroyed by the act of God or a public enemy, before the time of delivery expires. 2 Rorer on Rys., sec. 1313. To make a time contract, there must be mutuality of obligation and express stipulation. It has been held, "that the making arrangements to run special fruit trains from fruit growing districts to market, and holding out public notice thereof, and of the time to be made by trains as to their arrival at market, is not regarded in law as creating a special contract between railroad corporations so holding out inducements and the shippers absolutely within the advertised time." Rorer on Rys., sec. 1313. The findings of fact of the court nowhere show an *express stipulation* that the sheep should be carried to Chicago within four days from the time of shipment, nor would the facts shown by the record authorize a conclusion that there was any such stipulation. And we do not think that the statement of Eads, that there would be no delays, when taken in connection with all the other facts found, is sufficient to show such an express contract, assuming he had the authority to make it.

The authority conferred by the court (appointing him) on the receiver of the railroad of appellant is not shown by the record in the case. And in the absence of such showing, it will be presumed that he was empowered to manage and operate the International & Great Northern Railroad, which necessarily devolved upon him the duties and responsibilities of a common carrier for hire, and cast upon him, in his official capacity, in operating said road, the same duties and obligations that were on the company before his appointment. Beach on Receivers, secs. 359, 724. But we can not assume that his authority, duty, or liability could be extended beyond the road so as to authorize him to make contracts for carriage of freight over other roads of which

he had no control, and thus make the property placed in his hands for preservation liable for the failure of other companies to perform his contracts. A receiver is not authorized, without previous direction of the court, to incur any expense on account of the property in his hands beyond what is absolutely essential to its preservation and use, as contemplated by his appointment. Cowdrey v. Railway, 93 U. S., 352. In this State our statute provides, that "a receiver shall have power, under the control of the court, to bring and defend actions in his own name as receiver, to take charge and keep possession of the property, to receive rents, collect, compound for compromise demands, make transfers, and generally to do such acts respecting the property as the court may authorize." Sayles' Civ. Stats., art. 1464. And as he is a ministerial officer appointed to take possession and preserve, pendente lite, the fund or property in litigation, it may well be doubted whether a court in this State can confer upon him any authority that is not embraced in the powers conferred by statute, or such as may be necessarily incidental to them. However this may be, certainly it can not be assumed, in the absence of proof of the powers granted by the court, that it conferred upon a receiver powers in excess of those prescribed by statute, and such as are incidental to them. It can not be contended that the powers conferred by statute would authorize a receiver to make such a contract as the court below found was made in this case by the receiver through Homer Eads, as his agent. The receiver was himself only an agent of the court, with authority necessarily limited to such powers as the court appointing him was authorized by law to confer; and no presumptions can be indulged as to his authority outside of what the court was authorized to bestow upon him. True, he could appoint agents and employ servants to aid him in the performance of his trust; but he could not delegate to such agents or servants authority which he did not himself possess. The authority of the receiver of appellant to make such a contract as the District Court concluded was made by him not being shown, and there being no presumption that it was authorized, we are constrained to hold, that if such a contract was made by Eads as the agent of Campbell, the receiver, it would be void as against the receiver officially, and consequently the appellant, for lack of authority. We therefore conclude that the court below erred in its first conclusion of law.

As to the fifth conclusion of law found by the District Court: It is, where a carrier deviates *without necessity* from the regular and usual course, he is held responsible for any loss which may occur, whether by the act of God or from any other cause. Hutch. on Carr., sec. 190. In this case, the deviation from the usual or stipulated route was caused by unprecedented floods, which rendered it absolutely necessary for the sheep to be carried over the Cotton Belt instead of the St. Louis, Iron Mountain & Southern Railroad, to prevent their loss, or at least a much greater delay than actually occurred. It might as well be said that a carrier whose vessel is driven from its usual course by a

storm, or has been compelled to change her route to avoid being captured by a pirate, would, by reason of such deviation, be responsible for damages caused by the delay occasioned thereby. We therefore conclude that the court erred in its fifth conclusion of law, in holding that appellant, on account of having deviated from its route, became an insurer of the stock and liable for an injury occasioned thereto, from any cause.

As to the sixth conclusion of law: It will be seen from the pleadings that there was no allegation on the part of appellee, either in his amended original or supplemental petitions, that the contract was made with reference to overflows and washouts on the St. Louis, Iron Mountain & Southern Railroad. The pleadings as to the condition of said road caused by unprecedented floods came from appellant as a defense to the alleged delay, and there was nothing pleaded by appellee in avoidance. If the case had been tried by a jury, and the court had instructed it in accordance with its sixth conclusion of law, such an instruction would have been erroneous in not being warranted by the pleadings; and we think it equally erroneous for a court to make such a finding and predicate its judgment upon it.

It is unnecessary for us to pass upon the question as to whether the written contract was the one governing this shipment. If it was, the appellee in this action could not recover on it, because it was not declared on, but was expressly denied by him. Besides, appellant's receiver did everything that could be required of him under such contract. If such a contract was never made by the parties, neither could be affected by it.

The judgment of the District Court is reversed, and as it should have been for the appellant in the court below, judgment is here so rendered.

*Reversed and rendered.*

Delivered June 27, 1894.

James, Chief Justice, did not sit in this case.

### ON MOTION FOR REHEARING.

NEILL, Associate Justice.—It is urged by appellee that this court erred in holding that the record does not show an express contract, because, as the trial court's conclusions of fact were not excepted to, the statement of facts agreed upon by the parties supplies all deficiencies in such conclusions that the statement of facts itself contains; and that it conclusively shows an express contract for the shipment within four days' time, and "special." In referring to the negotiations between Eads and appellee, contained in the statement of facts, we find nothing from which even an inference can be drawn that such a contract as is contended for by appellee was ever made. The only thing that squints towards it is, that appellee told Eads that he

"wanted a quick run," and that Eads "said it would take four days to get them on the Wednesday morning market;" and that he would give appellee a quick run, and as appellee had ten cars he would run them as "special." To make a contract which enlarges a carrier's liability so as to waive the limited protection which the law affords him when entered into, it "must be done by clear and precise language; for the law will not imply from any doubtful language such an intention, but will rather presume, when the meaning of the contract is doubtful, that it was not his intention to waive a protection so reasonable and so important to him. Express language will be required to impose upon a party the responsibility of an insurer beyond his legal obligation, or to prevent the operation of the customary rule in cases where the act of God or inevitable accident excuses the nonperformance of a contract." Hutch. on Carr., 2 ed., secs. 171, 172. We have searched the record in vain for evidence sufficient to warrant us in holding that such a contract as is contended for by appellee was ever entered into between the appellee and the receiver of appellant's railroad. If such a contract was never entered into between Homer Eads, as the agent of the receiver, it is a matter of no moment whether the receiver was authorized to make it or not. The authority of the receiver is important only in the event his agent undertook to make such contract, for the purpose of determining its validity.

But we still adhere to what we have said as to such authority, and, as an additional authority, cite Deposit Vault Company v. McNulta, United States Supreme Court, decided May 14, 1894, 153 U. S., 554.

The motion is overruled.

*Motion overruled.*

Delivered September, 1894.

Writ of error refused, November 19, 1894.