### GALVESTON, H. & S. A. RY. CO. v. BREAUX et al.

(Court of Civil Appeals of Texas. Galveston. May 15, 1912. Rehearing Denied Oct. 10, 1912.)

1. CARRIERS (§ 47*) — CONTRACTS — AGENTS— POWERS.

An agent of an initial carrier receiving goods for transportation to a foreign country has no power to contract with the shipper that the sum paid for carriage shall cover import duties demanded by the foreign country, where the charge demanded is the amount fixed according to tariffs promulgated by the carriers, and filed with and approved by the Interstate Commerce Commission.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 107, 108, 134–141, 204; Dec. Dig. § 47.*]

2. CARRIERS (§ 116*)—CHANGE OF ROUTE— LIABILITY.

A carrier changing without necessity the routing of a shipper is responsible for any loss which may occur, whether by act of God or any other cause.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 488; Dec. Dig. § 116.*]

3. CARRIERS (§ 176*)—CHANGE OF ROUTE— LIABILITY.

Where the connecting carrier selected by a shipper refuses to accept the shipment tendered by the initial carrier, the initial carrier should advise the shipper of the fact, depositing the freight in a warehouse if necessary, and await further instructions, but where the initial carrier in an effort to expedite the shipment sends it by another connecting carrier, and no loss is occasioned by such change of route, and the same delay would have happened had the route not been changed, the initial carrier is not liable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 766–774; Dec. Dig. § 176.*]

Appeal from District Court, Galveston County; Clay S. Briggs, Judge.

Action by P. H. Breaux, in his own right and as assignee, against the Galveston, Harrisburg & San Antonio Railway Company and others. From a judgment for plaintiff against certain of the defendants, and in favor of other defendants, the defendant named appeals. Reversed and remanded.

Baker, Botts, Parker & Garwood, of Houston, and W. T. Armstrong, of Galveston, for appellant. James B. & Charles J. Stubbs, of Galveston, for appellees.

McMEANS, J. Plaintiff P. H. Breaux, in his own right, and as assignee of S. A. Breaux and L. L. Toups, instituted this suit against the Louisiana Western Railroad Company, Morgan's Louisiana & Texas Railroad & Steamship Company, Texas & New Orleans Railroad Company, Galveston, Harrisburg & San Antonio Railway Company, Southern Pacific Company, and Mexican Central Railway Company to recover damages for loss and breakage of certain household goods contained in two car load shipments made January 28, 1907, one from Hayes, La., a station on the line of the Louisiana Western Railroad, and the other from Raceland, La., a station on Morgan's Louisiana & Texas Railway & Steamship Company's line, the destination of both shipments being Rascon, in the state of San Luis Potosi, Mexico, and to recover further damages alleged to have been sustained by plaintiff and his assignors and their families on account of inconvenience, discomfort, hardship, and exposure due to delay or detention of the goods during the course of transportation. A trial before a jury resulted in a verdict and judgment in favor of plaintiff against the Mexican Central Railway Company for the sum of $296.70, being for the loss and breakage of goods, and against the Galveston, Harrisburg & San Antonio Railway Company for the sum of $2,500 as damages for inconvenience, hardship, and exposure growing out of the failure of plaintiff and his assignors to have the use of the goods shipped during the period of detention. A judgment on the verdict of the jury was entered in favor of all the other defendants.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

The Galveston, Harrisburg & San Antonio Railway Company alone has appealed.

The evidence in the record justifies the following fact conclusions: On the 28th day of January, 1907, P. H. Breaux and S. A. Breaux and L. L. Toups delivered a car load of household and kitchen furniture, house furnishings, and wearing apparel at Hayes, La., to the Louisiana Western Railroad Company, for which the consignor received a bill of lading issued to the Illinois Canal Company for delivery to the Rascon Development Company, at Rascon, Mexico, for account of the shippers, and on the same date the same parties delivered to Morgan's Louisiana & Texas Railroad & Steamship Company at Raceland, La., another car load of such goods, receiving a bill of lading issued to P. H. Breaux for delivery to P. H. Breaux in care of the Rascon Development Company, at Rascon, Mexico. The two car loads were routed by direction of the shippers via San Antonio and Laredo, Tex. At the time of shipment the consignors informed the agents of the railroad companies that they were moving with their families to Mexico, and the nature of the goods shipped, and that the shippers and their families would be subjected to discomforts, inconvenience, hardships, and exposure, unless the shipments were transported promptly and with reasonable dispatch. The freight rate from points of shipment to Rascon was $1.32 per hundred pounds, and the freight on a car load, based on a minimum weight of 22,046 pounds, amounted to $291.03 for each car, and this amount was prepaid or caused to be prepaid to each of the carriers by the consignors. While the evidence conclusively shows, we think, that the sum of $291.03 was the charge made and collected for the transportation of the goods only, and was not intended and did not in fact cover the duties laid by the Mexican government on goods of the character shipped on their importation into Mexico, it was testified by two of the parties who owned the goods and interested in the shipment that the respective agents of the receiving carriers represented to them that said sum of $291.03 covered charges of every character, including the duties at the Mexican port of entry, and we therefore find that such representations were so made, and that the agents of the respective carriers attempted to contract for their principals that the goods should be transported from points of origin to destination for the sum of money demanded and received by them and that this sum was to pay all charges, including import duties at the Mexican port of entry. The testimony does not even tend to show that such agents had any power or authority to make such contracts, and this is especially true with reference to such a contract as would be binding upon connecting carriers. We find in this connection, however, that the freight rates charged on the shipments in question were fixed according to tariffs promulgated by the receiving carrier and filed with and approved by the Interstate Commerce Commission, and that these tariffs cover freight charges only and specifically, except the absorption of cost of making entry at the Mexican border, and the rates as shown in the tariffs do not include the duty charges assessed by the Mexican government.

The two car loads were routed by the initial carriers via Texas & New Orleans Railroad to Houston, from there over the Galveston, Harrisburg & San Antonio Railroad to San Antonio, from there over the International & Great Northern Railroad to Laredo, and thence over the Mexican National and Mexican Central Railways to Rascon. The goods were with reasonable promptness transported to San Antonio, and there tendered by the Galveston, Harrisburg & San Antonio Railroad Company to the International & Great Northern Railroad Company for transportation to Laredo, but this railroad company, for reasons which do not clearly appear, refused to receive the shipments and carry the same to Laredo, whereupon the agent of the Galveston, Harrisburg & San Antonio Railroad Company, in order to expedite the shipments, diverted the same via El Paso, thence over the Mexican Central Railway to destination, without notice to the consignors or the consignees of its intention so to do, and proceeded to carry the goods on its own line to El Paso without unusual delay, and there made prompt tender of the shipments to the Mexican Central Railway Company. The goods in question were subject to a high rate of duty under the laws of Mexico, but by compliance with certain requirements the second-hand household furniture, of which the shipments were principally comprised, could be admitted duty free by permission of the Secretary of the Treasury of the Mexican Republic. These requirements, in part, were that the owner should address a petition to the Secretary of the Treasury of Mexico, stating the name of the petitioner, the number of persons in his family who accompanied him, the profession or trade of the applicant, the immediate first residence in a foreign country, stating the length of time he had resided there, the date of his arrival in the Republic of Mexico, the maratime or frontier port through which he entered, his present point of residence in Mexico, and a declaration of whether he had exercised his profession or trade since his arrival. Many of the facts necessary to be stated in the petition were required to be proved by the affidavits of persons other than the applicants. The regulations required that a copy of the rental contract or lease of the house occupied by the petitioner or about to be occupied by him should accompany the petition, and also required a detailed statement

of the articles comprising the set of household effects to be imported, including personal baggage, showing the approximate price of each article, and set of articles, destined to any special purpose, and the length of time they had been in use. The requirements are involved and intricate, but, when all have been sufficiently complied with, the Director General of Customs reports thereon to the Secretary of the Treasury, and that official decides whether the petition shall be granted or denied, and, if granted, whether all the articles on the list will be entered duty free or only a portion of them. The Director General of Customs then issues instructions for the free admission of the goods for which the privilege is granted, and for the clearance thereof. The Mexican law provides certain other formalities which must be complied with by the owner before his goods can be admitted free of duty. It does not appear that under the laws referred to that goods such as were contained in the shipments could or would be admitted into Mexico without the payment of duty upon the petition of a common carrier of the goods or of any corporation or of any person other than the owner.

The same requirements are exacted for the entry of goods into Mexico at Laredo, whether upon the payment of duty or for entering them free, as at El Paso; and the record discloses no facts to support the conclusion that had the goods been carried to Laredo the duties would have been less, or compliance with the requirements of the law for their free admission would have been less exacting, or that the time in which the goods could have been gotten in free would have been shortened. Soon after the shipments reached El Paso and were tendered to the Mexican Central Railway Company, the customs agent of that company on February 20, 1907, notified the Rascon Development Company, the consignee of one of the car loads, and in whose care the other was consigned that the shipments had arrived, and requested the company to advise him whether it expected to have an order from the Director General of Customs for the free importation of the household goods, or what disposition to make of the shipments. To this inquiry the Rascon Development Company replied on March 3, 1907, asking the customs agent to act as its agent in clearing the cars. To this the agent replied that he was having the cars revised, and that he must have a guaranty to cover freight and duties. To this the development company replied that it would "guarantee charges by bank or your agent, wire how much." It appears, however, that this guaranty was never given. On one of the cars there was a lot of farming implements, which in no event could be admitted into Mexico without the payment of duty, and these, about the middle of May, 1907, on the order of the Rascon

150 S.W.—19

Development Company, which was then acting as the agent of the owners, were taken out of the car, the duty on them paid, and they were then transported to Rascon by the Mexican Central Railway Company without any unusual delay. About this time the owners of the goods began to take steps to have the household goods admitted free, and their efforts were not crowned with success until September 3, 1907, when permits for free entry were forwarded to the collector of customs at Juarez, and were by him delivered to the customs broker of the Mexican Central Railway Company in the latter half of that month. The goods after final checking and revision by the customs broker and after the preparation of the consular invoice which necessarily accompanies such a shipment into Mexico, and which in its making required great care and considerable time, were crossed over the river into Juarez on October 7, 1907. The goods were not released and cleared through the Mexican customhouse in Juarez until the 6th or 7th of November, 1907, when they were forwarded to Rascon and reached there about November 28, 1907. It appears that the owners of the goods, had they so desired, could have deposited a sum of money sufficient to cover the duty with the proper Mexican officials, and have had the goods forwarded at once to Rascon, and that the sum so deposited would have been returned to them when the Treasury Department issued its order for free importation; but no such deposit was made or tendered.

Appellant's first assignment of error is that the verdict of the jury is contrary to the law and the evidence, in that the entire evidence shows that the owners of the goods were solely responsible for the detention thereof at El Paso, and that the appellant was not responsible therefor. In view of our findings of fact, this assignment must be sustained. It is clear that the goods reached El Paso within a reasonable time after they left the point of shipment, and that no complaint can be predicated for delay in the transportation of the goods to El Paso. It is clear, we think, that the delay after the goods reached the place last named was due to the fault of the owners in not paying the duty on them, or making a deposit of a sufficient amount to cover the duty while their petition for free admission was pending—in either event the goods could have proceeded without delay—and in allowing the goods to remain in El Paso while they were obtaining the order for free admission.

[1] But appellees contend, in effect, that at the time of contracting with the railway agents at the point of origin for the shipments it was agreed that the $291.03 paid for the carriage of each car load of goods to Rascon should cover the import duties levied by the Mexican government, as well as the freight charges, and therefore it became

the duty of the carriers under the contracts to transport the goods to their destination, and they cannot shield themselves from responsibility for the delay because the goods could not enter Mexico and be carried to Rascon without the payment of duty. As before shown, there is evidence in the record which justifies the conclusion that the agent represented, and undertook to contract, that the goods would be carried to Rascon for $291.03 for each car load, and that this sum should include the duties, if any, that would have to be paid when the goods reached the Mexican border. The testimony, regardless of any representation made by these agents, or of any contract made or attempted to be made by them on behalf of the carriers to pay the duty, leaves no room to doubt that the amount exacted was for freight charges only, and that these charges were fixed according to tariffs promulgated by the receiving carriers and filed with and approved by the Interstate Commerce Commission, and that these tariffs cover freight charges only, and specifically except the absorption of costs of making entry into Mexico, and do not include the duty charges assessed by the Mexican government. We think that the making of such a contract by the agents of the initial carriers was beyond the purview of their agency and the scope of their power, and was of no binding force or effect upon their principals. Gulf, Colorado & Santa Fé Ry. Co. v. Jackson, 99 Tex. 343, 89 S. W. 968; Railway v. Belcher, 88 Tex. 550, 32 S. W. 518; Railway v. Faulkner, 88 Tex. 649, 32 S. W. 883; Railway v. Best, 93 Tex. 347, 55 S. W. 315; Railway v. Dinwiddie, 21 Tex. Civ. App. 344, 51 S. W. 353.

[2] Nor do we think that under the facts of this case the appellant, by merely changing the routing of the shipment from the Laredo route to the El Paso route, became responsible to appellees for the damages growing out of the delay at the latter place, if it was not otherwise responsible. It was only after the International & Great Northern Railroad Company had refused to accept the shipments and transport them to Laredo that the routing was changed, and the change was made in order to expedite the shipment. No delay of any consequence occurred from the time the cars left San Antonio until they reached El Paso. The same laws of Mexico affecting the entry of and payment of duty upon the goods at El Paso applied also at Laredo, and the same formalities were required both in the payment of duty as well as in obtaining an exemption from such payment at the one place as well as at the other. The evidence does not authorize the conclusion that the same delay would not have

occurred at Laredo had the goods been carried there, but the contrary. It is a general rule that, where a carrier deviates without necessity from the regular and usual course, he is held responsible for any loss which may occur, whether by the act of God or from any other cause. Hutch. on Carriers, § 190. Here the deviation was caused by the refusal of the International & Great Northern Railroad to accept the shipments tendered it, and the desire of appellant to expedite the transportation.

[3] Ordinarily, where a carrier is confronted with a condition which renders it impossible to have the goods, when they reach the end of its line, carried over the connecting carrier selected by the shipper, it is its duty to advise the owner of the goods of that fact, depositing them in a warehouse if need be, and should wait for further instructions. But if, instead of following this rule, the carrier, in an effort to expedite the shipment, sends them by a carrier other than the one selected by the owner, and when it is shown that no loss or damage was occasioned by the change of the route, and made reasonably to appear that the same delay which caused the damage would have happened had the route not been changed, the carrier will be excused. When the International & Great Northern Railroad Company refused to accept the shipments when tendered to it, the appellant was confronted with the question as to whether it should store the goods at San Antonio and so notify the owner or undertake to have them transported over another route. It chose the latter, and it does not appear that the delay was caused by this deviation. By the change in the routing no additional burden was laid on the shipper, the tariff rates to destination being the same on either route. We think it clear that the damages sustained by appellees were not proximately caused by the deviation. Lawson on Carriers, 13; Railway v. Wentworth, 8 Tex. Civ. App. 5, 27 S. W. 680; Railway v. Jones, 29 S. W. 695; Railway v. Bland, 34 S. W. 675.

Upon the whole case, we believe that the delay at El Paso was chargeable solely to the acts and conduct of the owners in permitting the goods to remain there while seeking permission from the Mexican government for their admission without the payment of duty, and that such delay was not chargeable to the default or negligence of appellant. The case seems to have been fully developed on the trial, and the judgment of the court below is reversed, and judgment here rendered for appellant.

Reversed and rendered.